## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GINA LATTURE,

       *Plaintiff*,

    v.

PRIORITY LIFE CARE, LLC,

       *Defendant*.

Civil Action No. 23-1364 (TJK)

## <u>MEMORANDUM OPINION</u>

In January 2021, Gina Latture began working as the director of marketing for Priority Life Care, LLC while the company prepared to open a new assisted-living facility in her native Southeast D.C. Her eight-month tenure in that role, though, was rocky. She did not always comply with Priority Life's "marketing non-negotiables"—core practices that the company had distilled into requirements for its marketing team. In July of that year, Priority Life placed her on a performance improvement plan that underscored heeding those rules. But things did not get better, and Priority Life fired her about a month later for insubordination and other conduct problems.

Suing under Title VII, Latture alleges that the real reasons for her firing were racial discrimination and retaliation, and that she endured a hostile work environment. She insists that several Priority Life employees made racist remarks during her time there. And her objection to one of those comments, in her view, caused Priority Life to place her on the improvement plan and then fire her. But Latture has not created a genuine dispute on the key issue for her discrimination claim: whether Priority Life's nondiscriminatory reason for firing her because of subordination was pretextual. Nor has she shown that her limited opposition to one racist remark caused Priority Life to take an adverse action against her three months later. And finally, the isolated remarks that

she points to were not severe or pervasive enough to alter the conditions of her employment, so

her hostile-work-environment claim falters too. Thus, the Court will grant Priority Life's motion

for summary judgment and enter judgment on its behalf.

## I.    Background

Founded in 2009, Priority Life Care, LLC aims to provide affordable housing to senior

citizens. ECF No. 33-1 ¶ 1. The company is headquartered in Fort Wayne, Indiana, but it even-

tually began managing Livingston Place in Southeast Washington, D.C. *Id.* ¶¶ 2, 5. This "brand

new assisted living facility" had "over 150 units" and was meant to serve low-income residents of

the District, especially those in Ward 8. *Id.* ¶¶ 5–6.

Gina Latture grew up in this part of D.C. ECF No. 33-1 ¶ 6. She applied to work for

Priority Life as the Director of Sales and Marketing at Livingston Place. *Id.* ¶¶ 6–7. In December

2020, Tammy Gerardot—Priority Life's Regional Director of Operations with "oversight respon-

sibility for Livingston Place"—and her colleague interviewed Latture for that role. ECF No. 29-5

("Gerardot Dec.") ¶ 5; *see also* ECF No. 33-1 ¶ 7. Gerardot "approved making" Latture "an offer

of employment," *see* Gerardot Dec. ¶ 5, and Latture began working for Priority Life in early Jan-

uary 2021, *see* ECF No. 33-1 ¶ 8.[1]

Latture's "primary duty" as Livingston's head of sales and marketing was to "[m]anage

and create strategic initiatives" that would "maximize admissions" to the facility. ECF No. 29-3

at 88. In other words, her main job was "build[ing], grow[ing], and maintain[ing] an acceptable"

---

[1] Latture insists that she received the offer "from Defendant" Priority Life, not from Gerar-
dot. For support, she cites Exhibit 1 of her deposition testimony—a letter from "Tammy Gerardot"
describing the "offer of employment." ECF No. 29-3 at 84–85. Latture does not dispute that
Gerardot interviewed her, and Gerardot explained in her declaration that she "approved making"
the "offer." Gerardot Dec. ¶ 5. In short, there is no genuine dispute that Gerardot was personally
involved in the hiring decision for Latture and sent her the offer letter.

number of residents in Livingston as the facility opened its doors.[2]  ECF No. 33-1 ¶ 8; *see also* ECF No. 29-3 at 11–12.  But Priority Life also has "marketing non-negotiables" that, as the name suggests, represent a "core set of processes and tools" that marketers are "train[ed]" on and "expected to use."  ECF No. 29-6 ¶ 6; ECF No. 29-3 at 155–57.  For example, "callbacks" must happen the "same day" as an inquiry, and the same is true for entering sales leads into Priority Life's database for managing customer relationships.  ECF No. 29-3 at 156; *see also* ECF No. 29-6 ¶ 6.  The marketing plan must also use MailChimp—an email-marketing platform—to create monthly email communications to referral contacts.  ECF No. 29-3 at 156.  Latture received marketing materials describing these non-negotiables and, in late January 2021, participated in marketing training.  ECF No. 33-1 ¶ 10.

Because construction was still underway when Latture joined the team, she worked in a satellite office until early April 2021.  ECF No. 33-1 ¶¶ 12–13.  She shared that office with two people: Gail Jernigan, the Executive Director at Livingston, and Ashley Lawrence, who worked on low-income housing credits.  *Id.* ¶ 13.  Jernigan and Latture moved into the offices within Livingston in early April, as did Michelle Pierson, the Business Office Manager.  *Id.* ¶ 14.  Other than Jernigan and Pierson, everyone working at Livingston—including Latture—was black.  *Id.* ¶ 19. But members of Priority Life's "corporate leadership team" periodically traveled to Livingston to prepare for its opening, which Priority Life had to postpone from April 1 to June 4, 2021.  *Id.* ¶¶ 20–21.  Gerardot visited Livingston several times "before and after th[at] opening," and Clayton

---

[2] Latture partially disputes this statement of material fact, but she never denies that her job included these duties.  Instead, she claims only that Priority Life's "sales and marketing plan was ineffective."  ECF No. 33-1 ¶ 8.  And although Latture often raises that point when "disputing" Priority Life's asserted facts, it is often non-responsive and thus not a proper way to controvert the fact.  *See, e.g., id.* ¶ 10 (repeating this dispute in response to a factual statement that Latture received certain marketing materials and training).

Brightwell—the Director of Corporate Training and Finance Liaison—was on site at least once. *Id.* ¶ 21.

Between her deposition testimony and declaration, Latture says that she heard several remarks that she considered discriminatory while working for Priority Life. The company claims that some comments never happened, but of course Latture gets the benefit of the doubt as the non-movant. The first remark occurred while Latture, Jernigan, and Lawrence were working in the satellite office before moving in early April 2021. There, Jernigan called Lawrence an "ignorant 'black' bitch." ECF No. 33-2 ("Latture Dec.") ¶ 26; ECF No. 33-1 ¶ 27. Latture was nearby and objected to this remark, prompting Jernigan to say that she "at least . . . did not use the 'N' word." Latture Dec. ¶ 26. After moving to the Livingston offices, Jernigan apparently "consistently ma[d]e fun of and mimicked black coworkers" but never used a "racial slur in front of" Latture. *Id.* ¶¶ 27–28. Latture also overheard Brightwell mention on a phone call with an "unknown person" that Livingston was in "the straight up hood with nothing but ghetto blacks and hood rats." ECF No. 33-1 ¶ 25; ECF No. 29-3 at 24. She did not think that "Brightwell was aware that she could hear what he was saying," and she said nothing about Brightwell's comments to anyone. ECF No. 33-1 ¶¶ 25–26. Pierson, for her part, once told Jernigan that a homeless woman "smell[ed] like cooch" but never "mention[ed] the race of the" woman in that conversation. *Id.* ¶ 30; ECF No. 29-3 at 38. Finally, Latture recounts several comments that Gerardot made during her visits. When Gerardot became frustrated after an approved potential resident decided not to move into Livingston, she commented that "these people" "live in the ghetto" and asked why they don't "want to live better." ECF No. 33-1 ¶ 31; Latture Dec. ¶ 30. Gerardot also once asked "investors" to "guess how many bodies had been found at the gas station next store." ECF No. 33-1 ¶ 32; Latture Dec. ¶ 32. And while talking with Jernigan in Jernigan's office, Gerardot said that

4

a group of men hanging around the gas station looked like a "pack of animals" or "monkeys." ECF No. 33-1 ¶ 33; Latture Dec. ¶ 31.

With one exception, Latture never reported any of these comments.  *See* ECF No. 33-1 ¶ 34.  She did not lodge an internal complaint with Priority Life's human resources team, *see id.*, even though the employee handbook that she received described the company's "harassment policy" barring racial discrimination and "direct[ing]" employees to "report instances of harassment" so that they could "be investigated," *id.* ¶ 9.  Nor did she tell Brightwell, Pierson, or Gerardot that she heard their comments or found them offensive.  *Id.* ¶¶ 26, 30, 34.  Latture did, however, object to Jernigan when Jernigan called Lawrence an "ignorant black bitch."  *Id.* ¶ 27.

Meanwhile, Livingston was struggling.  The facility had only one resident when it opened on June 4, 2021.  ECF No. 33-1 ¶ 37.  Gerardot emailed Latture during this "stressful period," *id.*, explaining that "[n]umbers are low" and that "the outreach, events, and marketing efforts" must be "beefed up," ECF No. 29-5 at 24–25.  Priority Life's leadership identified several things it wanted Latture to do differently to align with the marketing non-negotiables.  For example, Latture had "problems" with Priority Life's database that was supposed to log "report[s] on the status of" resident "leads and referrals."  Gerardot Dec. ¶ 11; Latture Dec. ¶ 36.  Latture explains that she created a spreadsheet to track this information instead.  Latture Dec. ¶ 35.  But problems persisted even after Latture told Gerardot and others that her difficulties accessing the database were resolved by June 25.  *See* ECF No. 29-5 at 12.  Jernigan reported that Latture had not consistently made her entries, *see id.* at 42–43; Gerardot Dec. ¶¶ 20, 22, and Gerardot told Latture that the database was not "current . . . the last time [she] looked," ECF No. 29-5 at 35.  In early July, moreover, an approved candidate sent an "e-mail complaint" to Livingston because the "qualified

candidate had not heard from [Latture] since being approved" in June.  ECF No. 33-1 ¶ 38.[3]  That prompted a member of Priority Life's leadership team to remind Latture that she must "call back [the] same day" that the inquiry comes in.  ECF No. 29-5 at 19.

Given these issues, Priority Life placed Latture on a performance improvement plan in early July.  ECF No. 33-1 ¶ 41.  That plan identified several "areas of concern."  ECF No. 29-5 at 27.  First, Latture was "[n]ot utilizing [the database] to manage inquiries" despite having received the necessary training.  *Id.*  Second, she was not adequately using the "MailChimp email blasting platform as outreach for referral partners and prospective residents."  *Id.*  Although Latture was "required" to send 40 such emails between February and May, she had sent only 6.  *Id.*  Third, Latture was also inadequately using "OneDay Video as a Marketing Platform" for referral partners and potential residents.  *Id.* at 28.  So the improvement plan outlined a three-step corrective path with specific directives: Latture had to make entries into the database "[e]very day"; use Mail-Chimp to "[c]reate at least two communications per month"; and use the "One Day app" in the circumstances detailed in the "[m]arketing non-negotiables."  *Id.*

Latture had a different view of why things weren't going well at Livingston.  Certain "requirements for Medicaid" impeded the facility's ability to get residents, so she claims that she focused her marketing efforts on individuals who had "the Medicaid Waiver" and would thus "be eligible to Livingston Place [sic]."  Latture Dec. ¶¶ 3–8.  Priority Life, Latture believed, just did not understand how to successfully market Livingston in Southeast D.C.  *Id.* ¶¶ 7–8.  Instead, Priority Life was sticking to its ineffective marketing non-negotiables, which she thought "should have been considered void and later renegotiated."  *Id.* ¶¶ 4–7.  Latture also believed that an

---

[3] Latture "denie[s] in part" this fact, but her belief that "it was not possible to return all calls on the same day" does not dispute that she failed to respond to this candidate.  ECF No. 33-1 ¶ 38.

"assistant" should "complete data entry" and "return calls," but Priority Life—despite hiring an assistant for her—still wanted Latture to enter the data. *Id.* ¶¶ 44–45.

All of this came to a head on August 11, 2021, when Gerardot decided to fire Latture. ECF No. 29-5 at 41–42; ECF No. 33-1 ¶ 55. The day before, Jernigan had emailed Gerardot about an "angry response" that "she received from" Latture after asking whether Latture "had contacted a specific referral they were pursuing." Gerardot Dec. ¶ 20. Jernigan also said that Latture had not been "entering information in" the database "daily" and "continued to disagree with being required to enter every call she makes into the system." *Id.* And on August 11, Jernigan sent Gerardot another email detailing Latture's failures to enter data and apologizing to a Priority Life employee for "how confrontational" Latture had been. *Id.* ¶ 22. That email "also alerted" Gerardot of "a pattern of insubordinate conduct and 'temper control' issues that" Latture had shown. *Id.* ¶ 23. Based on all that information and "the information" Gerardot "already had about" Latture's "performance and behavior," Gerardot decided that her "employment should be terminated." *Id.* Jernigan told Latture about the decision on August 12 and gave her the "termination letter from Ms. Gerardot." ECF No. 33-1 ¶¶ 58–59. That letter "confirm[ed]" the discussion, explaining that Priority Life had fired Latture for "discourteous or inappropriate behavior" that included "insubordination and unprofessionalism." ECF No. 29-3 at 196. About three weeks later, Priority Life hired Brandon Webb, a black man, to replace Latture as Livingston's Director of Sales and Marketing. ECF No. 33-1 ¶ 63.[4] Gerardot "was involved in interviewing" Webb and "approv[ing]" that "hiring" decision. *Id.*

Latture filed a charge of discrimination with the Equal Employment Opportunity

---

[4] Latture did not respond to this asserted fact. That non-answer "fail[s] to properly address [the] fact," so the Court finds that it "is undisputed for purposes of the summary-judgment motion." *Lawrence v. Lew*, 156 F. Supp. 3d 149, 154 (D.D.C. 2016) (citing Fed. R. Civ. P. 56(e)).

Commission in May 2022.  ECF No. 33-1 ¶ 76.  About nine months later, she sued Priority Life in D.C. Superior Court, bringing claims under Title VII (disparate treatment, retaliation, and hostile work environment) and for wrongful termination and tortious interference with business relations.  ECF No. 1-2 ¶¶ 31–67.  Priority Life removed the case to this Court, *see* ECF No. 1, and moved to dismiss the latter two counts, *see* ECF No. 4.  The Court granted that motion.  After completing discovery, Priority Life moved for summary judgment on the Latture's Title VII claims.  ECF No. 29.

## II.    Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A fact is "material" if it could affect the outcome of the litigation under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the Court must "view the evidence in the light most favorable to the [nonmovant]"—here, Latture—"draw all reasonable inferences in that party's favor, and avoid weighing the evidence or making credibility determinations."  *Thompson v. District of Columbia*, 967 F.3d 804, 812–13 (D.C. Cir. 2020) (citation omitted).  But in opposing summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  So if the evidence that the nonmovant relies on is "'merely colorable' or 'not significantly probative'" such that no reasonable factfinder could rule in that party's favor based on that evidence, then "summary judgment may be granted."  *Bradley v. D.C. Pub. Sch.*, 222 F. Supp. 3d 24, 28 (D.D.C. 2016) (quoting *Anderson*, 477 U.S. at 249–50).  Thus, although at summary judgment the Court does not weigh

the evidence or find the facts, the Court must decide whether the nonmovant's evidence is proba-

tive enough that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Johnson v. Perez*,

823 F.3d 701, 705 (D.C. Cir. 2016).

## III.    Analysis

Title VII of the Civil Rights Act of 1964 "is central to the federal policy of prohibiting

wrongful discrimination in the Nation's workplaces." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 342 (2013).  One provision targets status-based discrimination by making it "unlawful"

for an employer "to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race" or other protected

characteristic.  42 U.S.C. § 2000e-2(a)(1).  Another protects against retaliation by prohibiting em-

ployers from "discriminat[ing] against" employees for "oppos[ing] any practice" that Title VII

makes unlawful or for participating in a Title VII proceeding.  *Id.* § 2000e-3(a); *see also Steele v.

Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008).

Plaintiffs suing under either provision may prove their claims "by direct or circumstantial

evidence."  *Oviedo v. WMATA*, 948 F.3d 386, 394 (D.C. Cir. 2020).  The latter implicates the

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Oviedo*, 948

F.3d at 395.  To establish a prima facie case of racial discrimination under that framework, a plain-

tiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employ-

ment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Vickers

v. Powell*, 493 F.3d 186, 194 (D.C. Cir. 2007) (citation omitted).  Retaliation cases resting on

indirect evidence similarly require proof that "(1) [the plaintiff] engaged in protected activity; (2)

she suffered from a materially adverse act; and (3) a causal connection exists between the protected

activity and the employer's act."  *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 301 (D.D.C. 2015).

These inquiries streamline when the defendant "proffers legitimate, nondiscriminatory or

nonretaliatory reasons for the challenged actions." *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 187–88 (D.D.C. 2014).  In that context, the question boils down to "whether the defendant intentionally discriminated" or retaliated "against the plaintiff." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citation omitted); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).  For a discrimination claim, the plaintiff bears the burden of showing that "the defendant's legitimate, nondiscriminatory reason is a pretext for discrimination" or (in mixed-motive cases) that the "employment action was motivated by discrimination in addition to the proffered legitimate reason." *Morales*, 42 F. Supp. 3d at 188.  Similarly, for a retaliation claim, the plaintiff must show that the defendant's "asserted non-retaliatory reason was not the actual reason" for the employment action and that the defendant "intentionally retaliated against the employee." *Holmes v. WMATA*, 723 F. Supp. 3d 1, 19 (D.D.C. 2024) (cleaned up).

Finally, a hostile-work-environment claim under Title VII recognizes that "discriminatory intimidation, ridicule, and insult" can sometimes become "severe or pervasive" enough "to alter the conditions of the victim's employment" by "creat[ing] an abusive working environment." *Johnson v. Perez*, 66 F. Supp. 3d 30, 43 (D.D.C. 2014) (Jackson, J.) (internal quotation marks and citation omitted).  Still, the "conduct at issue" must "actually constitute[] discrimination because of the employee's protected status." *Id.* (internal quotation marks and citation omitted).  And because Title VII is not a "general civility code," the "[c]onduct must be extreme." *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012) (citation omitted).  Courts consider the "totality of the circumstances, including the frequency of the discriminatory [or retaliatory] conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* (alteration in original) (citation omitted).

Latture presses three claims under Title VII: race-based disparate treatment, race-based

hostile work environment, and retaliation.  *See* ECF No. 1-2 ¶¶ 31–52.  In moving for summary judgment, Priority Life contends that each falters for several reasons.  The Court agrees that each claim has at least one insurmountable flaw entitling Priority Life to summary judgment.  First, Priority Life's legitimate, nondiscriminatory reasons for firing Latture defeat her disparate-treatment claim.  Second, her retaliation claim fails for lack of causation.  And third, Latture has not cleared the high bar for showing that the remarks she heard created a hostile work environment.

### A.    Latture Fails to Show that a Reasonable Jury Could Find that Priority Life Discriminated Against Her Because of Her Race

Priority Life begins by arguing that Latture has not established that discriminatory racial animus motivated its decision to fire her.  ECF No. 29-1 at 7–8.  In response, Latture does not suggest that another employment action could support this claim.  *See* ECF No. 33 at 27–31 (acknowledging Priority Life's contention that Latture's "disparate treatment claim is limited to her termination" and addressing only the reasons for termination).  Instead, she argues two points: she has (1) offered "direct evidence of discrimination," *id.* at 26, and (2) shown that Priority Life's reasons for firing her are "completely false," *id.* at 28.  Neither holds water.

Begin with Latture's purported "direct evidence" of racial discrimination.  "To qualify" as such, "a statement or remark must *itself* show[] . . . bias in the employment decision."  *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 146 (D.D.C. 2016) (citation omitted).  Seeking to meet that standard, Latture marshals several comments that she overheard: Gerardot's remarks about potential clients "liv[ing] in the ghetto" and not "want[ing] to live better"; Jernigan's "ignorant black bitch" comment to Lawrence; Pierson's remark about a woman smelling bad; Brightwell's phone conversation mentioning "ghetto blacks and hood rats"; and other references to "these people" and "those people."  ECF No. 33 at 26–27.  The problem for all these "statement[s]," though, is that they do not on their own show "bias against a protected class *in the employment decision*."

*Oviedo*, 948 F.3d at 394 (emphasis added) (citation and brackets omitted).  Put another way, Latture identifies no comment "by a decision maker involved in the employment decision . . . that explicitly mentions race as a factor in the decision making process."  *Markowicz v. Nielsen*, 316 F. Supp. 3d 178, 189 (D.D.C. 2018).  Instead, all the statements—to the extent they explicitly involve race at all—"arose in . . . entirely different context[s]."  *Conn*, 149 F. Supp. 3d at 146.  Because Latture offers no "evident connection between [any] remark and the adverse employment [action]"—that is, her firing—she has not presented "direct evidence of discrimination."  *Id.*

Latture's lone case supporting her direct-evidence argument shows what she is missing.  In *Ayissi-Etoh v. Fannie Mae*, the plaintiff claimed that his employer "explicitly denied him a raise because of his race."  712 F.3d 572, 576 (D.C. Cir. 2013).  So what would count as direct evidence that racial discrimination caused that adverse action?  A statement by the employer that race factored into the decision to deny the raise, such as: "For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money."  *Id.*  But that kind of evidence—a statement causally linking the employee's race to the challenged employment action—is lacking here.  So Latture has not presented "direct evidence" that would "entitle[]" her "to a jury trial."  *Id.* at 576–77.

As for indirect evidence of discrimination, the first step is pinning down Priority Life's nondiscriminatory reason for firing Latture.  Priority Life argues that Latture's "termination was prompted by documented, reported, and observed evidence of" her "repeated behavior that violated [its] standards of conduct."  ECF No. 29-1 at 9.  More specifically, Latture demonstrated "insubordinate" behavior by "continued noncompliance with the marketing non-negotiables"— even "after being put on the [performance improvement plan]"—and by reacting negatively to conversations about compliance.  ECF No. 34 at 13–15.  Such "insubordination" and

"unsatisfactory performance" are "commonly asserted legitimate, non-discriminatory reasons for taking an adverse employment action." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 118 (D.D.C. 2015) (collecting cases); *see also, e.g.*, *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 95 (D.D.C. 2007) ("Insubordination and violation of company rules are widely accepted non-discriminatory reasons for termination.").

Latture tries to show that this explanation is pretextual in a few roundabout ways. She starts by arguing that Priority Life cannot "hide behind the same actor defense." ECF No. 33 at 29. But that theory is not so much a "defense" as an "inference" that the employer may benefit from. Indeed, the "same-actor inference" holds that "when the person who made the decision to fire [is] the same person who made the decision to hire, it is difficult to impute . . . an invidious motivation that would be inconsistent with the decision to hire, especially when the firing has occurred only a short time after the hiring." *Hicklin v. McDonald*, 235 F. Supp. 3d 242, 248 (D.D.C. 2017) (quoting *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)). That inference seems to present "a significant . . . hurdle" for Latture. *Vatel*, 627 F.3d at 1247. Gerardot signed off on hiring Latture "less than a year"—in fact, only eight months—"before her dismissal." *Id.* And "it would be odd" to hire Latture "and then immediately start ginning up reasons to dismiss her." *Id.* But even if Latture is right that the inference packs less of a punch here for one reason or another, *see* ECF No. 33 at 29–30, that at most removes *extra* support for Priority Life's legitimate, nondiscriminatory reason for firing her. So mitigating (or even eliminating) the same-actor inference does not help Latture carry *her* burden of "produc[ing] sufficient evidence that" Priority Life's explanation "is pretextual and that [it] intentionally discriminated against her." *Vatel*, 627 F.3d at 1247.

Latture's focus on the race of her replacement falls in the same bucket. Within three weeks of firing Latture, Gerardot approved hiring Brandon Webb, a black man, to replace her. *See* ECF No. 33-1 ¶ 63. Hiring someone "within the same protected class" as the fired individual "cuts strongly against any inference of discrimination." *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005). Latture argues that "Southeast D.C. is majority African American," so a "high percentage of African Americans would apply" to work at Livingston. ECF No. 33 at 9. That reasoning is questionable; if Gerardot harbored racist views that caused her to fire Latture for being black, presumably she could have taken the time to find *some* non-black applicants and favor them in the hiring process. But again, even if Latture has undermined this inference to some extent, that is all she has done—mitigated (to some degree) an inference that might otherwise *help* Priority Life but does not move her closer to carrying *her* burden of establishing pretext and discrimination.

Latture also contends that Priority Life did not produce any "contemporary records detailing any deficiencies" in her job performance. ECF No. 33 at 28. She adds that the company's "business model did not take into consideration" key aspects of Southeast, D.C. demographics, suggesting that she was performing adequately despite the challenging parts of her job. *Id.* But "the perception of the decisionmaker" is what matters, and Latture "cannot establish pretext simply based on [her] own subjective assessment of [her] own performance." *Beyah v. Dodaro*, 666 F. Supp. 2d 24, 35 (D.D.C. 2009) (citation omitted). The same holds true for Latture's beliefs about the effectiveness and wisdom of Priority Life's marketing strategy, which she admits that she did "not always" satisfy "at the level that" Priority Life "wanted." ECF No. 29-3 at 14. Title VII does not permit the Court to second guess a company's decisions about how to run its marketing operations.

The record also shows that Gerardot had "a reasonable basis" for "conclud[ing] that" Latture's "conduct justified [her] termination" because she did not comply with Priority Life's marketing rules. *Hicklin*, 235 F. Supp. 3d at 247. An email thread from early July reveals that Gerardot and others learned about a potential resident whose inquiry Latture failed to respond to, violating Priority Life's rule about same-day responses. ECF No. 29-5 at 19–22. In another July email, Gerardot noted that Latture had seemingly failed to keep the database "current" despite resolving her access problems weeks earlier. *Id.* at 35. And the performance improvement plan from early July—perhaps the most direct evidence of performance deficiencies—describes several ways in which Latture had fallen short. *Id.* at 27–28. All this evidence lines up with Gerardot's explanation that in "the June-July 2021 timeframe," she became "concern[ed] about Ms. Latture's performance." Gerardot Dec. ¶ 13. In other words, "a wealth of evidence indicate[s]" that Priority Life had concerns about Latture's "deficiencies," and her "view[]" of those concerns—or the noncompliance that prompted them—"is irrelevant." *St. John v. Napolitano*, 20 F. Supp. 3d 74, 99–100 (D.D.C. 2013).

Latture takes one last stab at showing pretext by arguing that Jernigan "submitted false accusations" that prompted her firing. ECF No. 33 at 30–31. She leaves it at that, declining to explain what the false reports said or how they influenced the firing decision. *See id.* at 31. That is not enough to carry her burden of showing pretext; "judges are not like pigs, hunting for truffles buried in the record." *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (cleaned up) (citation omitted). In any event, the Court's review of the record suggests that Latture may be referring to communications between Jernigan and Gerardot in the days surrounding her firing. On August 10, Jernigan emailed Gerardot and described how Latture was not "entering anything daily" into the database. ECF No. 29-5 at 37. Early the next morning, Jernigan followed up by documenting

the database entries—including "0 entries" for many days. *Id.* at 42–43. That email also apologized to a different employee for how "confrontational" Latture became. *Id.* And finally, Jernigan drafted a written statement dated August 11 that described problems with Latture's behavior, but only after Gerardot had decided to fire Latture and requested the statement. *Id.* at 42, 47; *see also* Gerardot Dec. ¶¶ 23–24.

But Latture fails to offer a non-speculative basis for finding that discriminatory animus rather than honestly held concerns about her insubordination motivated Jernigan's emails. One problem is that Latture does not say which allegations she thinks are "false," so the Court cannot untangle whether a particular part of Jernigan's communications suggests pretext and discrimination. *See* ECF No. 33 at 31. Beyond that deficiency, "there is simply no probative evidence to support" her theory that Jernigan was trying "to paper the record for the ultimate firing and thereby hide an improper racist . . . motivation." *Vatel*, 627 F.3d at 1248. Jernigan's emails did not raise concerns from out of left field. Rather, she said that Latture was not making daily entries into the database, disagreed with having to enter every call, and became confrontational—and not for the first time. ECF No. 29-5 at 37, 42–43. Gerardot already knew about the database-entry problems because the performance improvement plan had flagged that deficiency and Gerardot had observed it in another email. *Id.* at 27–28, 35. The improvement plan also described how Latture had repeatedly breached Priority Life's rules for marketing. *Id.* at 27–28. In this way, one of Jernigan's emails just documents what the database "says" about Latture's database entries: for several weeks, she had not been complying with Priority Life's rules and the directives of her improvement plan. *Id.* at 43. Again, Latture might have disagreed with Jernigan's view of her compliance and insubordination, but she offers no reason to think that Jernigan did not "honestly believe[]" that Latture had shown these deficiencies. *Hicklin*, 235 F. Supp. 3d at 247 (citation omitted). Her

vague allegation that Jernigan submitted false accusations "point[s] to" no "specific facts in the record that reveal a genuine issue" about whether Jernigan lied. *Campbell v. District of Columbia*, 126 F. Supp. 3d 141, 148 (D.D.C. 2015); *see also* ECF No. 33 at 30–31 (asserting that Jernigan "submitted false accusations" without citing any part of the record).

All told, Latture has not offered a non-speculative basis to find that Jernigan—motivated by "racial animus toward" Latture—lied about insubordination problems to get her fired and that the ultimate firing decision followed from a racially motivated false report. *Bradshaw v. Vilsack*, 560 F. Supp. 3d 101, 143 (D.D.C. 2021). That is true even if Latture has created a disputed factual issue about whether Jernigan had "a general bias against [black] employees." *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016). She needs "more than" that—specifically, "enough evidence for a reasonable jury to find that her [firing] was motivated by that bias." *Id.* And on that front she falls short.

In sum, a reasonable jury could not find "*both* that the reason" Priority Life gave for firing Latture "was false, *and* that discrimination . . . was the real reason." *Weber v. Battista*, 494 F.3d 179, 186 (D.C. Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). So Priority Life is entitled to summary judgment on her disparate-treatment claim.

**B.    Latture Fails to Show that a Reasonable Jury Could Find that Priority Life Retaliated Against Her Because of Her Protected Activity**

As mentioned, Title VII prohibits employers from discriminating against employees for engaging in protected activity under the statute. Priority Life does not argue that it had a legitimate, non-retaliatory reason for firing Latture. Her retaliation claim fails instead, the company says, for two reasons: she did not engage in "protected activity" when she objected to Jernigan's comments, and she fails to show a causal connection between that objection (assuming it is protected activity)

and any adverse action.  ECF No. 29-1 at 10–11.  Because the Court agrees with the second point, it need not address the first.

A plaintiff bringing a retaliation claim under Title VII must show that "her protected activity was a but-for cause of the alleged adverse action by the employer."  *Nassar*, 570 U.S. at 362. That standard requires evidence "that *no* adverse action would have been taken if" the plaintiff "had not" engaged in the protected activity.  *Gonda*, 79 F. Supp. 3d at 303.  Latture "points to no direct evidence of retaliation," so she must rely on circumstantial evidence, which is "generally limited to conduct occurring shortly after the employee's protected activity."  *Ruppe v. Blinken*, 743 F. Supp. 3d 1, 25 (D.D.C. 2024) (citation omitted).  In Latture's view, she offers enough causation evidence because the temporal gap between her purported protected activity—objecting to Jernigan calling Lawrence an "ignorant black bitch"—and the alleged adverse action—being placed on the performance improvement plan in early July—is not that large.[5]  ECF No. 33 at 31–32.

But Latture has a more fundamental problem.  To show causation through temporal proximity, a plaintiff must also establish "that the official responsible for the alleged retaliatory act was aware of the protected activity."  *Gonda*, 79 F. Supp. 3d at 301.  That makes sense.  If the "alleged discriminating official[]" did not know about "prior protected activity" before "contemplating adverse action," then the employment action can hardly stem from retaliation for such activity.  *McIntyre v. Peters*, 460 F. Supp. 2d 125, 134 (D.D.C. 2006).  And recall that Latture opposed Jernigan's comments to only one person: Jernigan.  Gerardot, for her part, "had no knowledge of Ms. Jernigan

---

[5] Priority Life appears to concede that placing Latture on the performance improvement plan could be an adverse action—an argument that Latture makes only for her retaliation claim. *See* ECF No. 34 at 21–23.  But whether the adverse action is the improvement plan, the termination, or both makes no difference to the Court's analysis.

referring to Ashley Lawrence as a 'black bitch,'" or of Latture "object[ing] to or complain[ing] about" that comment.  ECF No. 33-1 ¶ 61.[6]  So even if the performance improvement plan counts as an adverse action, the record shows that Gerardot—who "was involved in putting Ms. Latture on" that plan, *see* Gerardot Dec. ¶ 16—did not know about Latture's opposition before Gerardot "contemplat[ed] [the] adverse action."  *McIntyre*, 460 F. Supp. 2d at 134.[7]

Latture's retaliation claim would falter on causation even without that defect, though.  To start, she overstates the value of the temporal proximity here.  The smallest timing gap that a reasonable jury could find between the purported protected activity and adverse action is about three months: Jernigan made the comment sometime between January and early April, so the end of that window is roughly three months before the early July decision to place Latture on the improvement plan.  ECF No. 33-1 ¶¶ 13, 27, 41; *see also* ECF No. 29-5 at 27–28.  And although there is no "bright-line three-month rule," this "Circuit has generally found that such gaps negate the temporal proximity needed to help a plaintiff prove causation."  *Holmes*, 723 F. Supp. 3d at 23.  The D.C. Circuit has, for example, cited with approval cases holding that a "two-month period between

---

[6] Latture "[d]enie[s] in part" this statement of fact, but her denial is limited.  ECF No. 33-1 ¶ 61.  She says that she "told Jernigan that her racist comments were offensive and" that "Gerardot herself made racist comments."  *Id.*  That denial says nothing about the key point here: whether Gerardot was "aware of any allegation" that "Latture objected to or complained about" Jernigan's comment to Lawrence.  *Id.*  Because Latture offered only "additional facts" and did "not actually dispute [Priority Life's] asserted fact," the Court finds this "assertion of fact" about Gerardot's lack of knowledge "undisputed."  *Toomer v. Mattis*, 266 F. Supp. 3d 184, 191 (D.D.C. 2017).

[7] Latture does not argue that Jernigan—who did know about Latture's opposition—decided (or participated in the decision) to place her on the performance improvement plan.  That is waiver.  As the "non-moving party," Latture "is responsible for demonstrating a[] genuine dispute of material fact that would preclude summary judgment."  *Mosleh v. Howard Univ.*, No. 19-cv-339 (CJN), 2022 WL 898860, at *15 n.6 (D.D.C. Mar. 28, 2022).  So her "failure to oppose a basis for summary judgment" on the ground that Jernigan took part in the improvement-plan decision "constitutes waiver of that argument."  *Id.* (citation omitted).  The Court will not construct an argument for her from whole cloth, particularly because Latture is represented by counsel.

protected activity and" the "employee's discharge" does not "establish[] a 'causal connection' between the two events." *Taylor v. Solis*, 571 F.3d 1313, 1323 (D.C. Cir. 2009) (brackets omitted) (quoting *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 995 (7th Cir. 2001), and citing *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)). And the Supreme Court has done the same for a case holding that a three-month gap was "insufficient." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)).

So Latture's reliance on (at best) a period of three months is shaky, even putting aside Gerardot's lack of knowledge. Compounding that problem is the evidence of Latture's "unsatisfactory work performance"—the common and straightforward reason for placing an employee on a performance improvement plan. *Gonda*, 79 F. Supp. 3d at 303. Again, she admits that she thought Priority Life's marketing non-negotiables were mistaken and that she did "not always" complete them "at the level that [Priority Life] wanted." ECF No. 29-3 at 14; *see also* ECF No. 33-1 ¶ 35.

Given all these causation defects, a reasonable jury could not find "that *no* adverse action would have been taken if [Latture] had not complained about" Jernigan's comment to Lawrence. *Gonda*, 79 F. Supp. 3d at 303. So Priority Life is entitled to summary judgment on the retaliation claim.

## C.    Latture Fails to Show that a Reasonable Jury Could Find that Priority Life Subjected Her to a Hostile Work Environment

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (citation omitted). Priority Life argues that no such violation happened here for

three reasons: no "contributory act of harassment" occurred within the limitations period, so the claim is time-barred; the conduct that Latture relies on is not "sufficiently severe or pervasive" to satisfy the demanding standard; and Priority Life cannot be liable given Latture's unreasonable failure to report the harassing acts under the company's anti-harassment policy.  ECF No. 29-1 at 13.  The second argument is dispositive, so the Court begins and ends there.

Latture's claim suffers from one general problem and two more specific ones.  Typically, "offhand comments[] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Akonji*, 517 F. Supp. 2d at 97 (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)).  Even when those "isolated incidents" involve "offensive language"—or "even ethnic or racial slurs"—they seldom clear the high bar for hostile-work-environment liability.[8]  *Nagi v. Chao*, No. 16-cv-2152 (KBJ), 2018 WL 4680272, at *3 (D.D.C. Sept. 28, 2018) (Jackson, J.).  This limitation on Title VII's reach "has long been clear."  *Id.*  And it explains, for example, the result in *Harris v. Wackenhut Services, Inc.*, 590 F. Supp. 2d 54 (D.D.C. 2008), *supplemented by* 648 F. Supp. 2d 53 (D.D.C. 2009).  There, the plaintiff argued that his exposure to several racist comments—a racist "riddle," a "black bitch" remark, and a reference to a black person "liv[ing] in the ghetto"—was enough for his hostile-work-environment claim.  *Id.* at 61–62, 75.  The court disagreed, however, because the "incidents of harassment must be"—but were not—"sufficiently continuous and concerted" such that they were "pervasive."  *Id.* at 75.  The D.C. Circuit affirmed on that point, reasoning that the plaintiff's

---

[8] The possible exception is the "n-word"—an "unambiguously" and "deeply offensive racial epithet."  *Toomer v. Esper*, 464 F. Supp. 3d 157, 169 (D.D.C. 2020) (citations and emphasis omitted).  Indeed, the "D.C. Circuit [has] recognized that" a "single incident" of using that word "*might*" be "sufficient to establish a hostile work environment."  *Id.* (quoting *Ayissi-Etoh*, 712 F.3d at 577).  That is not this case.  Jernigan's statement that "at least I didn't call [Lawrence] the N word" is (to say the least) distasteful, but it does not implicate the potential exception for times when a supervisor *actually uses* the racial slur itself.  ECF No. 33-1 ¶ 27.

evidence of "only three racially motivated comments directed at him during a one-year period" was "not sufficiently extreme for" him "to prevail." *Harris v. Wackenhut Servs., Inc.*, 419 F. App'x 1, 1–2 (D.C. Cir. 2011).

The remarks that Latture highlights are no doubt offensive, but they are not "severe or pervasive" enough to "alter the conditions of [her] employment and create an abusive working environment." *Johnson*, 66 F. Supp. 3d at 43 (citation omitted). As in *Harris*, the comments are "episodic" rather than "continuous and concerted." 590 F. Supp. 2d at 75 (citation omitted). And two features of Latture's evidence further diminish the severity of the remarks. First, several comments are "not related to" Latture's "race," so they "cannot be used to support [her] hostile work environment claim." *Kelley v. Billington*, 370 F. Supp. 2d 151, 158 (D.D.C. 2005). Pierson, for example, "did not mention the race of the homeless person" whom she said smelled "like cooch." ECF No. 33-1 ¶ 30; *see also* ECF No. 29-3 at 37–39. Because a race-based hostile-work-environment claim requires proof "that the conduct at issue . . . actually constituted discrimination *because of* the employee's" race, the Court must "exclude from consideration" remarks "lack[ing] a linkage of correlation to the claimed ground of discrimination." *Johnson*, 66 F. Supp. 3d at 43 (emphasis added) (internal quotation marks and citation omitted).

Second, Latture focuses on "racial statements" and other comments that "were not directed to" her, which "generally" means that a plaintiff "cannot . . . establish[]" a "hostile environment." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005). For instance, Brightwell was talking to an "unknown person" on the phone when Latture purportedly heard him mention "ghetto blacks and hood rats." ECF No. 33-1 ¶ 25. And Jernigan told *Lawrence* that she was an "ignorant black bitch." *Id.* ¶ 27. Gerardot's comments were also directed "to third parties" and are thus "less indicative of a hostile work environment." *Kelley*, 370 F. Supp. 2d at 159. Even if her comments

about the dead bodies at the gas station had a racial connotation, they were not "directed specifi-cally at" Latture but were parts of conversations with investors and Jernigan. *Id.*; *see also* ECF No. 33-1 ¶¶ 32–33. So too for her alleged offensive comment that a group of men near the gas station "looked like a pack of animals or monkeys." ECF No. 33-1 ¶ 33 (internal quotation marks and citation omitted). She said that "in a separate conversation in Ms. Jernigan's office" while Latture "was in her own office." *Id.* In short, although these "purported use[s] of" of racialized "comments" might have "cause[d]" Latture "discomfort," the record shows that most remarks were not "even directed at" her. *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 124 (D.D.C. 2004) (holding that "ethnic slurs, sexist comments, and inappropriate age statements" did not rise "to the level of creating a hostile work environment," in part for that reason). And this feature of the evidence further undermines Latture's theory that these comments created a hostile work environ-ment.

Because Latture fails to show that a reasonable jury could find that she endured a hostile work environment, Priority Life is entitled to summary judgment on this claim.

## IV.    Conclusion

For all the above reasons, the Court will grant Defendant's Motion for Summary Judgment and enter judgment on its behalf. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 28, 2025